UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

---

In re:

MARONE ACEE,

                Debtor.

Chapter 12
Case No. 12-61631 (Main Case)

---

In re:

BOULDER MEADOWS,

                Debtor.

Chapter 12
Case No. 12-61632

Jointly Administered[1]

---

APPEARANCES:

| | |
|---|---|
| PETER A. ORVILLE, P.C. <br> *Attorneys for Debtors* <br> 30 Riverside Drive <br> Binghamton, New York 13905 | PETER A. ORVILLE, ESQ. |
| NEMETI McDERMOTT EPPOLITO & HEDGLON <br> *Attorneys for Oneida Savings Bank* <br> 112 Farrier Avenue, Suite 208 <br> Oneida, New York 13421 | ANTHONY P. EPPOLITO, ESQ. |
| RIEHLMAN, SHAFER & SHAFER <br> *Attorneys for Access Federal Credit Union* <br> P.O. Box 430 <br> Tully, New York 13159-0430 | AMANDA C. SHAW, ESQ. |
| MARK W. SWIMELAR, ESQ. <br> *Standing Chapter 12 Trustee* <br> 250 South Clinton Street, Suite 203 <br> Syracuse, New York 13202 | MAXSEN D. CHAMPION, ESQ. |

**MEMORANDUM-DECISION AND ORDER**

      Marone Acee ("Acee") and Boulder Meadows, Inc. ("Boulder Meadows") (collectively, "Debtors") filed for relief under chapter 12 of the Bankruptcy Code[2] on August 31, 2012.

---

[1] By Order dated October 2, 2013, the Court granted Debtors' motion for joint administration filed on August 22, 2013, and therein designated Case Number 12-61631 as the main case. (ECF No. 115.)

Debtors filed chapter 12 plans in their respective cases on February 14, 2013. (ECF Nos. 61 and 34, respectively.) On March 5, 2013, Oneida Savings Bank ("OSB") filed an objection to confirmation of the chapter 12 plan in each case. (ECF Nos. 65 and 37, respectively.) On March 6, 2013, Access Federal Credit Union ("AFCU") also filed an objection to confirmation of the chapter 12 plan in Acee's case. (ECF No. 66.) These secured creditors base their objections, in part, on Debtors' alleged inability to qualify for chapter 12 relief as family farmers under the Bankruptcy Code.[3]

OSB contends Debtors are not family farmers because their income is derived from an extensive clay pigeon shooting range, gun club, pistol range, stocked pheasant hunts, and other related recreational activities. OSB further argues that Acee divested himself of significant farming assets, thereby causing a sharp decline in farm related activities and income during the past several years. AFCU similarly asserts that Debtors' operation of a game farm, which AFCU classifies as a recreational enterprise, does not constitute a farming operation. Specifically, AFCU states that Debtors cannot be considered family farmers because customers engaged in pheasant hunting are not purchasing an agricultural product from them but rather are paying for the experience of hunting and shooting a live moving target. AFCU also contends that the type of operation run by Debtors is not affected by the inherent risk and cyclical uncertainties that traditional farmers encounter. Finally, AFCU argues that the majority of Debtors' debt is non-farming consumer debt, such that their entire debt load does not support their classification as family farmers.

---

[2] Unless otherwise indicated, all statutory references are to the United States Bankruptcy Code, 11 U.S.C. §§ 101–1532 (2010).

[3] OSB's objection in Boulder Meadows' case does not raise an eligibility challenge, yet the parties have proceeded as if the objection had properly done so. Given the same and the interconnection between Acee and Boulder Meadows, as explained herein, the Court will address the qualifications of both Debtors for eligibility under chapter 12.

During Acee's confirmation hearing on March 14, 2013, the Court set a briefing schedule and directed the parties to file supplemental memoranda of law addressing the threshold question of whether Acee may be a debtor under chapter 12 of the Bankruptcy Code. Acee filed his brief on April 26, 2013. (ECF No. 75.) OSB filed its reply brief on May 2, 2013 (ECF No. 77), and AFCU filed its reply brief on May 3, 2013 (ECF No. 79). The Court then issued a Scheduling Order on May 14, 2013, setting this limited issue for an evidentiary hearing on August 27, 2013. At the hearing, the Court heard testimony from two witnesses, namely Acee and Gary W. Conklin ("Conklin"), the latter of which Debtors' counsel qualified as an expert witness in the field of agriculture. In lieu of closing arguments, the Court permitted the parties to submit closing briefs. OSB filed its brief on September 30, 2013 (ECF No. 112), and Debtors filed their brief on October 2, 2013 (ECF No. 116). Based upon the documentary and testamentary evidence produced at the hearing, this decision constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052, to the extent made applicable to this jointly administered matter by Federal Rule of Bankruptcy Procedure 9014(c).

## JURISDICTION

The Court has jurisdiction over this core proceeding pursuant to 28 U.S.C. §§ 157(a), (b)(1), and (b)(2)(L), and 1334(a).

## FACTUAL BACKGROUND

Acee testified that he was raised on a crop and dairy farm operated by his grandfather and then his father, which he and two other family members took over when his father retired. At the time, the farm consisted of 3,000 acres of field crops, including both small fruits and vegetables, and livestock. As of the petition date, Acee was the sole shareholder of three separate corporate entities: (1) Boulder Meadows, which owns approximately 300 acres in Vernon and Augusta,

New York (the "Boulder Meadows Property"); (2) Vernon National Shooting, Inc. ("Vernon National"), which does not own any assets; and (3) Stop Seven Operating Corporation ("Stop Seven"), which issued stock but owns no hard assets or equipment and conducts farming operations to grow strawberries, corn, tomatoes, and other fruits and vegetables.

Acee testified that he had to liquidate a considerable amount of equity in connection with or following his divorce. He reduced his crop acreage to 1,000 acres and, in light of the economic reality that his field corn and dairy businesses were losing money, he began looking for alternative options and sources of revenue. Acee sold certain parcels of property or acreage to his son, and presently grows only berries on his remaining farmland. Additionally, Acee researched and ultimately chose to begin a pheasant hunting operation on the Boulder Meadows Property. Acee placed, a portion of the Boulder Meadows Property into the Conservation Reserve Program ("CRP") administered by the United States Department of Agriculture's Farm Service Agency ("FSA"),[4] and Boulder Meadows then rented that land to Vernon National. Acee testified that he is licensed through the New York State Department of Environmental Conservation to purchase and release pheasants, which he houses in a former barn on the Boulder Meadows Property. He purchases the pheasants from a third party because he is not licensed as a breeder and he incubates the birds for two to three weeks until they are fully grown and ready for release. His objective is to keep the pheasants free from disease and safe from predators during this brief timeframe. In addition to beginning the pheasant hunting operation,

---

[4] The USDA's Web site at http://www.apfo.usda.gov/FSA/webapp?area=home&subject=copr&topic=crp explains:
   The Conservation Reserve Program (CRP) is a land conservation program administered by the Farm Service Agency (FSA). In exchange for a yearly rental payment, farmers enrolled in the program agree to remove environmentally sensitive land from agricultural production and plant species that will improve environmental health and quality. Contracts for land enrolled in CRP are 10-15 years in length. The long-term goal of the program is to re-establish valuable land cover to help improve water quality, prevent soil erosion, and reduce loss of wildlife habitat.

Acee also became licensed through Cornell to make and sell value added products, including jam, tomato sauce, and vinegar, using the crops grown by Stop Seven.

As reported on Acee's individual tax returns, his income consists of net profits from Stop Seven and partnership or corporate income from Vernon National and Boulder Meadows. (Debtors' Exs. B-1–B-3.) In 2011, Acee's Schedule E to his individual tax return reported $8,971.00 from Boulder Meadows and $42,861.00 from Vernon National, equating to a total partnership or corporate income of $51,832.00. (Debtors' Ex. B–3.) Of the $42,861.00 from Vernon National, Acee concedes that 40%, or $17,144.40, is non-farm income because it is derived from clay pigeon shooting. The remaining 60%, or $25,716.60, however, he claims is farm-income because it is derived from pheasant harvesting, although he testified that an unknown percentage of this income comes from membership dues, sales of ammunition, and other tangential sales. Based on his individual tax returns, his Schedule C gross income for 2011 was $15,818.00. By comparison, in 2010, Acee's individual tax return reported $9,715.00 from Boulder Meadows and $799.00 from Vernon National, equating to a total partnership or corporate income of $10,514.00. (Debtors' Ex. B–2.) His Schedule C gross income for 2010 was $28,211.00. In 2009, Acee's individual tax return reported $9,484.00 from Boulder Meadows and $6,370.00 from Vernon National, equating to a total partnership or corporate income of $12,219.00. (Debtors' Ex. B–1.) His Schedule C gross income for 2009 was $41,250.00. Consistent with Acee's testimony regarding the changing nature of his business operations, in 2009 and 2010, Stop Seven was by far the most profitable enterprise, and all of Debtors' income was derived from the crop farming operation. (Debtors' Exs. B-4–B-11.)

Turning to Debtors' liabilities, Acee's Schedule D of the petition lists secured debts in the sum of $480,680.87. According to his testimony, the aggregate amount of $299,454.00 on

Schedule D is attributable to loans or real property taxes related to his personal residence or non-farm property. Of the debts listed on Schedule D, the following relate to his personal residence: (1) $68,000.00 home equity loan owed to AFCU; (2) $11,390.00 property taxes owed to Oneida County; (3) $175,000.00 mortgage loan owed to OSB; and (4) $38,000.00 junior mortgage loan owed to OSB. An additional $7,064.00 is owed to Oswego County for property taxes on non-farm property. Finally, $1,839.38 owed to Best Buy is a secured consumer debt rather than a farm debt. Acee's Schedule F listing unsecured nonpriority debts includes a total of $65,147.02. According to his testimony, all but $8,095.69 of the amount listed on Schedule F constitutes farm debt.

Boulder Meadows has its own liabilities. Boulder Meadows' petition reports only liabilities associated with the real property held in its corporate name. Its Schedule D includes mortgage and real property tax debt on the Boulder Meadows Property in the aggregate amount of $170,503.00.

## DISCUSSION

A debtor filing a chapter 12 petition bears the ultimate burden of proving eligibility for relief as a family farmer. *In re Tim Wargo & Sons, Inc.*, 869 F.2d 1128, 1130 (8th Cir. 1989). Under the applicable law, "[o]nly a family farmer . . . with regular annual income may be a debtor under chapter 12" of the Bankruptcy Code. 11 U.S.C. § 109(f). A "family farmer" is defined as:

> (A) [an] individual . . . engaged in a farming operation whose aggregate debts do not exceed $3,792,650 and not less than 50 percent of whose aggregate noncontingent, liquidated debts (excluding a debt for the principal residence of such individual unless such debt arises out of a farming operation), on the date the case is filed, arise out of a farming operation owned or operated by such individual . . . , and such individual . . . receive[s] from such farming operation more than 50 percent of such individual's . . . gross income for–
> (i) the taxable preceding year; or

  (ii) each of the 2d and 3d taxable years preceding the taxable year in which the case concerning such individual . . . was filed; or
(B) [a] corporation or partnership in which more than 50 percent of the outstanding stock or equity is held by one family, or by one family and the relatives of members of such family, and such family or such relatives conduct the farming operation, and
  (i)  more than 80 percent of the value of its assets consists of assets related to the farming operation;
  (ii) its aggregate debts do not exceed $3,792,650 and not less than 50 percent of its aggregate noncontingent, liquidated debts (excluding a debt for one dwelling which is owned by such corporation or partnership and which a shareholder or partner maintains as a principal residence, unless such debt arises out of a farming operation), on the date the case is filed, arise out of the farming operation owned or operated by such corporation or such partnership; and
  (iii) if such corporation issues stock, such stock is not publicly traded.

11 U.S.C. § 101(18). While the tests to qualify as family farmers differ for individuals and corporate or family partnerships, both require that the debtor be engaged in a "farming operation" at the time the case is commenced. Both tests also incorporate the farm debt test that not less than 50 percent of the debtor's noncontingent, liquidated debts at the time the case is commenced, other than debts for a dwelling used as a principal residence, must arise out of such operation. To qualify for chapter 12 protection, an individual must also satisfy the percentage of income or farm income test. In the present case, OSB has focused exclusively on the "farming operation" requirement for both Debtors and the related farm income test for Acee, while AFCU has mainly challenged Acee's ability to satisfy the farm debt test. As no other elements under § 101(18) are contested, the Court will similarly limit its discussion to those in dispute.

  A.  **Defining What Constitutes a "Farming Operation"**

  The key term "farming operation" is defined to include "farming, tillage of the soil, dairy farming, ranching, production or raising of crops, poultry, or livestock, and production of poultry or livestock products in an unmanufactured state." 11 U.S.C. § 101(20). This list is not all-inclusive, thus other activities may be considered farming operations. *In re Watford*, 898 F.2d

1525, 1527 (11th Cir. 1990) (collecting cases). When deciding the question of law whether a particular activity constitutes a farming operation, courts construe this definition liberally in order to further Congress' primary purpose behind the adoption of chapter 12 of helping family farmers to continue farming. *Id.* (collecting cases).[5] When applying former § 101(17), currently codified at § 101(18), one court aptly stated that it would "not confine itself to a natural or traditional, or even a dictionary definition of 'farming operation,'" as "other businesses which do not seem to fall within what is traditionally thought of as farming, . . . may well qualify for Chapter 12." *In re McKillips*, 72 B.R. 565, 568 (Bankr. N.D. Ill. 1987). Whether a particular debtor is engaged in a specific activity promoted as a farming operation is a question of fact, *Watford*, 898 F.2d at 1527, hence "each case must be decided on its own unique facts," *In re Buckingham*, 197 B.R. 97, 103 (Bankr. D. Mont. 1996) (internal citation and quotation marks omitted).

Since the 1980s, two main standards have evolved for determining whether a person, corporation, or partnership is eligible as a family farmer for chapter 12. The Court of Appeals for the Seventh Circuit developed the first view in the case of *Armstrong v. Corn Belt Bank*, 812 F.2d 1024, 1027 (7th Cir. 1987), wherein the majority opinion narrowly interpreted the "gross income from a farming operation owned or operated by such person" language to limit the special protections afforded by chapter 12 of the Bankruptcy Code to farmers "caught in a risk-ridden enterprise."[6] In other words, only those farmers whose activities "were exposed to the

---

[5] Because the main question to be decided here is one of law, the Court agrees with OSB that Conklin's expert testimony is of little use. The Court wishes to make clear, however, that its failure to recite and rely upon the same bears no reflection upon Conklin's expertise or witness qualifications.

[6] The debtor in *Armstrong* sought to avoid being placed in an involuntary bankruptcy pursuant to § 303, from which farmers are excluded, and therefore appealed the decision of the bankruptcy and district courts that he was not a farmer within the meaning of §§ 303(a) and the former relevant Bankruptcy Code sections. The question presented in that case was whether the debtor derived more than 80 percent of his gross income in the taxable year preceding the involuntary filing from a farming operation that he owned or operated. The Seventh Circuit Court of Appeals acknowledged the 1986 amendment to the Bankruptcy Code that created the "family farmer" and "family farmer

inherent risks and cyclical uncertainties traditionally associated with farming" were protected by the provisions of the Bankruptcy Code. *In re McNeal*, 848 F.2d 170, 171 (11th Cir. 1988). This "mechanistic risk analysis approach" was then extended to the chapter 12 environment, but it quickly drew heavy criticism from many courts. *In re Coulston*, 98 B.R. 280, 280 (Bankr. E.D. Mich. 1989) ("The purpose of [c]hapter 12 is to allow a class of debtors in an industry plagued by inherent and wide-ranging ups and downs the same chance at reorganization as small businessmen or individuals.") (citing *In re Tart*, 73 B.R. 78, 81 (Bankr. E.D. N.C. 1987)); *In re Teolis*, 419 B.R. 151, 156 (Bankr. D. R.I. 2009) ("The *Armstrong* approach has been criticized as being too narrowly focused, which may result in the exclusion of some debtors whom Congress intended to protect.") (collecting cases)).

Having found the majority opinion in *Armstrong* to be too restrictive, the dissent promulgated a second approach based on the totality of the circumstances. Circuit Judge Cudahy stated:

> Congress has provided only rough guidelines in defining what farm income is. Given the complex and difficult challenges to farmers today, it is appropriate for courts to try to draw realistic distinctions, as must be done here, on a case-by-case basis, focusing on whether the income in question is essentially derived from a farming operation that is owned or operated by the recipient of the income and that reflects the traditional farming risks of cyclical and unpredictable income.

*Armstrong*, 812 F.2d at 1031. "Most courts which have considered the question [of which test to apply] post-*Armstrong* have adopted the dissent's totality of the circumstances approach." *Coulston*, 98 B.R. at 282 (citing *In re Paul*, 83 B.R. 709, 712 (Bankr. D. N.D. 1988)).

---

with regular annual income" categories and chapter 12, but determined that the newly enacted law was not applicable in that case because the debtor could not have been classified under either definition. *Armstrong*, 812 F.2d at 1030. Notwithstanding the different context in which *Armstrong* was decided, given the statutory overlap and the fact that "farming operation" is the key term in both definitions of "farmer" and "family farmer," its analysis remains relevant to the question of eligibility under the current Bankruptcy Code sections.

There are no controlling decisions addressing this question within the Second Circuit that bind this Court. The Court is persuaded by the dissent in *Armstrong* as well as by the majority line of cases and, in particular, the bankruptcy court's reasoning in *In re Maike*, 77 B.R. 832, 835–36 (Bankr. D. Kan. 1987)*:*

> Farmers continually try new crops and enterprises in pursuit of profitability. . . . Farmers status should not depend on the court's recognition of the debtor's enterprise as a traditional farming enterprise.
> . . . .
> Farming as an enterprise has changed and the definition of law must also change. Formulation of an operable definition is difficult as no one factor should determine whether an individual or enterprise is a farming operation. Rather, the court should consider a number of factors in making the determination.

The *Maike* court further stated, "the legislative history mandates a broad interpretation of 'farming operation' to carry out the legislative intent. The courts should not adopt a single test of farming, but must keep in mind that agriculture changes." *Maike*, 77 B.R. 832, 839 (Bankr. D. Kan. 1987). The Court's own experience with chapter 12 debtors and cases bears witness to the truth of this statement. Accordingly, the Court will follow the totality of the circumstances line of cases now and in future cases.

Courts employing this approach consider several factors including, but not limited to: (1) whether the services or farm pursuits are carried out at a rural location; (2) the type of enterprise taking place at the location, which must be more than strictly service oriented or tangentially related to the breeding, maintaining, and marketing of animals, or the planting, maintaining, and harvesting of crops; (3) the type of product and its eventual market, although "the court should not be limited to products and produce which are traditionally associated with farming in [that] location;" (4) the debtor's role in the process, *id*. at 839; (5) the physical presence or absence of family members on the farm; (6) ownership of traditional farm assets; (7) whether the debtor is involved in the process of growing or developing crops or livestock; and (8) whether or not the

practice or operation is subject to the inherent risks of farming, *In re Sugar Pine Ranch*, 100 B.R. 28, 31 (Bankr. D. Or. 1989). In the present case, the majority of factors weigh in Acee's favor and compel the Court to find that Acee is engaged in a farming operation for purposes of the relevant Bankruptcy Code inquiry.

OSB and AFCU focus mainly on factors two through four and eight. Distinguishing the present case from *Maike*, where the debtors devoted nearly a fourth of their land to breeding and raising pheasants and growing feed for the pheasants, OSB and AFCU contend that Debtors' time and land is devoted only minimally to the actual pheasant operation. OSB also argues that Acee has divested himself of much of the crop growing activity, having transferred most of the property comprised of crop fields to his son. OSB similarly contends that enrollment of the Boulder Meadows Property in the CRP, coupled with the fact that it is unlikely Acee will return the Boulder Meadows Property post-CRP enrollment to traditional farming operations, should weigh against Acee in the Court's analysis.

The Court agrees with the majority line of cases, however, that adhere to a fairly broad case-by-case determination of what activity ought to be regarded as a farming operation. As to the second factor, the type of enterprise conducted at the farm location specifically, the Court finds that Acee's nontraditional game bird operation, in which he personally feeds, maintains, protects, and ultimately releases the pheasants, constitutes a farming activity. As to the third factor, the type of product and its eventual market, the Court subscribes to the *Maike* court's logic that the so-called "consumption" test is outdated and in many cases simply not viable. *Maike*, 77 B.R. at 835 n.1. Hence, the Court is not persuaded by AFCU's argument that the pheasants are not intended primarily for consumption, but rather for live target practice. As to the eighth factor, whether or not the practice or operation is subject to the inherent risks of

farming, the Court recognizes that some courts in the majority consider this while others do not. *Teolis*, 419 B.R. at 160 (Although finding it to be illogical, the court noted that "some courts apparently still consider this to be, if not the only factor, one of the more important ones in the analysis.") The bankruptcy court in *Teolis*, as does this Court, preferred the view that "that the nature of the debtor's activity, in the totality of the circumstances, is a more meaningful indicator of what is a 'farming operation,' than limiting the inquiry to the economic risks to which the activity is vulnerable." *Id.* The *Teolis* court nevertheless considered the farm risk factor for appellate purposes. Given the dearth of case law in the Second Circuit, the Court here will do the same. Risks associated with traditional farming include drought, flood, disease or insect infestation, frost, and fluctuating crop prices. *See id.* (collecting cases). As Acee testified, there is some risk to the pheasant enterprise from both disease and prey. Thus, even this factor weighs in Acee's favor. Based on the totality of the circumstances, given the above factors, together with the rural location, Acee's ownership of traditional farm implements and land, and his continued strawberry farming, the Acee's business as a whole constitutes a farming operation for purposes of chapter 12.

The Court's analysis with respect to Boulder Meadows, however, produces a different result for Boulder Meadows than for Acee. Boulder Meadows is simply a corporate landholder and landlord. Boulder Meadows does not conduct any corporate activities or provide any valuable or necessary services to Vernon National. Boulder Meadows does not have any ownership interest in Vernon National but rather collects rent from Vernon National. Further, Boulder Meadows' income is stabilized and guaranteed for as long as the Boulder Meadows Property remains in the CRP. Where, as here, a corporation is paid by farmers or lessees for services but does not derive its income from its own farming operation or production efforts and

therefore does not play an active role in the process or take any direct risk, the corporation does not meet the "farming operation" requirement. *See, e.g., In re Van Air Flying Service, Inc.*, 146 B.R. 816, 818 (Bankr. E.D. Ark. 1992) (collecting cases).[7]

### B. Determining Whether Acee Satisfied the Farm Income Test Under § 101(18)(A)[8]

The Court's finding that Acee's activities may be characterized as a farming operation for purposes of chapter 12 necessarily compels the Court to also find that Acee has met the farm income test, which requires that the farmer has received at least 50% of his gross income from such operation during the taxable year immediately preceding the taxable year in which the petition was filed or during each of the second and third years preceding the taxable year in which the petition was filed. The parties agree that the term "gross income" under § 101(18)(A) should be equated with the gross income definition provided in section 61(a) of the Internal Revenue Code. 28 U.S.C. § 61(a)(2010) ("gross income means all income from whatever source derived"); *In re Pratt*, 78 B.R. 277, 280 (Bankr. D. Mont. 1987). Moving beyond that simple definition, the parties disagree about which sources of income are in fact derived from Acee's farming operation.

At various points in this proceeding, OSB raised two primary arguments with respect to the classification of Acee's income as income derived from a farming operation. First, OSB challenged the inclusion of the CRP income that was paid from Boulder Meadows to Stop Seven and ultimately to Acee in Acee's gross income calculation. Case law makes clear, however, that agricultural subsidy payments are considered farm income for purposes of determining whether

---

[7] Because Boulder Meadows has not met its burden under § 101(18)(B), the Court's focus now shifts exclusively to Acee.

[8] The Court is taking the four-part test set forth in § 101(18)(A) out of order given the parties' heavy emphasis, consistent with the plethora of case law, on the "farming operation" and income elements set forth in § 101(18)(A). Very little has been written about the third element of the test, namely the farm debt test, by existing courts or by the parties in their submitted memoranda.

the farm income test is met under § 101(18)(A). *In re Way*, 120 B.R. 81 (Bankr. S.D. Tex. 1990) (the inclusion of both taxable and non-taxable subsidy payments should be considered an aspect of gross income in the bankruptcy context because it is consistent with the congressional intent of preventing only high-income, low non-farm debt tax shelter investors from qualifying for relief under chapter 12); *In re Fenske*, 96 B.R. 244 (Bankr. D. N.D. 1988) ("Those individuals who while actively engaged in farming, avail themselves of CRP and land conservation programs [to] maximize the profitability of their operations are no less engaged in a farming operation."). Hence, OSB's first argument must fail. Second, OSB intimates that the use of the business code for "hunting and trapping" for income derived from Vernon National on Acee's 2011 individual tax return should control. The description of a debtor's business as "recreational" and use of a non-farm related business code for tax reporting purposes, however, are not controlling. *In re Wolline*, 74 B.R. 208, 210 (Bankr. E.D. Wis. 1987) ("However the debtor described his activities for income tax purposes is not determinative upon whether he is a 'farmer' within the context of Chapter 12. It is the nature of his activities, rather than any labels which may have been placed upon them, which is important."). Accordingly, OSB's second argument also must fail. Notwithstanding Acee's inability to differentiate the revenue sources of Vernon National amongst the various subcategories of activities that Vernon National conducts, the combination of wages, CRP payments, strawberry crop and product proceeds, and pheasant related income certainly surpasses the fifty percent gross income threshold test for Acee to qualify for relief under chapter 12.

  **C.**  **Determining What Qualifies as Debt Arising Out of a "Farming Operation"**

For an individual to qualify as a family farmer, the individual must satisfy the fourth element of § 101(18)(A), or the farm debt test, which requires that not less than 50 percent of the

farmer's aggregate noncontingent, liquidated debts (excluding a debt for the principal residence of such individual unless such debt arises out of a farming operation), on the date the case is filed, arise out of a farming operation owned or operated by the farmer.  To determine whether this element is satisfied, § 101(18) directs that the Court first exclude from the debt calculation any debt for the farmer's principal residence unless that debt arose out of the farming operation. The criteria for making this determination are the reason or purpose for which the debt was incurred and the use to which the borrowed funds were put.  *Teolis*, 419 B.R. at 161 (citing *In re Douglass*, 77 B.R. 714, 715 (Bankr. W.D. Mo. 1987)).  "Home mortgages would thus be excluded unless the mortgage secures farm debt."  6-100 Collier Bankruptcy Practice Guide ¶ 100.03[c] (MB 2013).

Simply stated, if the debts relating to Acee's personal residence are included in the farm debt calculation, he will satisfy this element because $528,828.82, or approximately 96%, will be classified as farm related debt.  On the other hand, if they are excluded, he will not because only $236,438.82, or approximately 43%, will be classified as farm related debt.

Here, Acee has done no more than testify that he utilizes his personal residence as a home office from which he conducts certain business functions, including, but not limited to, the payment of bills.  No testimony was elicited from Acee regarding the use of the home equity or mortgage proceeds, and no evidence was presented to prove that the mortgages secure farm debt. In fact, Debtors' post-trial submission includes only the bare assertion of counsel that mortgages and property taxes on all of Acee's land should be included. On this element alone, Acee has therefore failed to carry his burden.

## CONCLUSION

Based on the foregoing, under the particular facts and circumstances presented, the Court concludes that neither Acee nor Boulder Meadows qualifies as a "family farmer" under § 101(18) and neither Debtor is therefore entitled to chapter 12 protection. Accordingly, it is

ORDERED, that Acee's chapter 12 case must be converted or dismissed within ten days from entry of this Memorandum-Decision and Order; and it is further

ORDERED, that Boulder Meadows' chapter 12 case must be converted or dismissed within ten days from entry of this Memorandum-Decision and Order.

It is SO ORDERED.

Dated: November 12, 2013
       Utica, New York

                                                       /s/Diane Davis_____
                                                       DIANE DAVIS
                                                       United States Bankruptcy Judge